*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0159**

State of Minnesota,
Respondent,

vs.

Kamal Elyas Maqadin,
Appellant.

**Filed October 3, 2016
Affirmed
Smith, John, Judge\***

Hennepin County District Court
File No. 27-CR-14-6551

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Minneapolis, Minnesota (for
respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Sara L. Martin, Assistant Public
Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Halbrooks, Presiding Judge; Johnson, Judge; and Smith,

John, Judge.

_____

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**SMITH, JOHN**, Judge

We affirm the district court's order revoking appellant's probation because the district court made a sufficient finding that the policies favoring probation no longer outweighed the need for confinement and because the district court's finding is supported by the evidence in the record.

**FACTS**

On March 9, 2014, appellant Kamal Elyas Maqadin and his cousin, Dalal Idd, went to the Lifetime Fitness in Eden Prairie. In the locker room, Maqadin watched while Idd assaulted a gym member, J.C., repeatedly punching J.C. in the face. J.C. suffered a number of injuries as a result of the assault, including a broken nose, facial lacerations and bruising, and lasting difficulties with long-term memory. Idd took J.C.'s phone and wallet, which contained about $200, and gave the money to Maqadin. Maqadin drove himself and Idd away from the gym. Police later located and arrested both Idd and Maqadin. Idd was carrying J.C.'s wallet, which contained J.C.'s driver's license and credit cards but no money, and Maqadin had concealed about $280 in his sock.

On March 11, 2014, respondent State of Minnesota charged Maqadin with aiding and abetting first-degree aggravated robbery. Maqadin waived his right to a jury trial, and the case proceeded to a bench trial on July 30, 2014. The district court found Maqadin guilty as charged. The court granted Maqadin a downward dispositional departure by sentencing him to 57 months' imprisonment, staying execution of the sentence for five years, and placing him on supervised probation. The court based its decision to grant a

departure on Maqadin's "passive or limited role . . . in the overall incident." The court placed a number of conditions on Maqadin's probation, including that he have no use of alcohol or controlled substances and complete treatment at Minnesota Teen Challenge (Teen Challenge).

Maqadin entered the inpatient treatment program at Teen Challenge on or about April 22, 2015, and completed the program on or about July 7. On July 30, Maqadin's probation officer filed a probation-violation report, alleging that, on July 29, Maqadin was arrested by Eden Prairie police for driving while impaired (DWI) with an alcohol concentration of 0.17. At Maqadin's request, the district court ordered a chemical-dependency assessment be performed on Maqadin, which recommended that Maqadin be placed in an intensive, outpatient treatment program. At a probation-violation hearing on October 28, Maqadin waived his right to require the state to prove his probation violations and admitted that he had been arrested and cited for DWI and that he had failed to abstain from alcohol. The court revoked Maqadin's probation and executed his sentence of 57 months' imprisonment.

This appeal follows.

## DECISION

"A district court has 'broad discretion in determining if there is sufficient evidence to revoke probation and should be reversed only if there is a clear abuse of that discretion.'" *State v. Modtland*, 695 N.W.2d 602, 605 (Minn. 2005) (quoting *State v. Austin*, 295 N.W.2d 246, 249–50 (Minn. 1980)). "Before revoking a probationary sentence, a district court must: (1) specifically identify the condition or conditions violated; (2) find that the

3

violation was intentional or inexcusable; and (3) find that the policies favoring probation no longer outweigh the need for confinement." *State v. Osborne*, 732 N.W.2d 249, 253 (Minn. 2007) (citing *Austin*, 295 N.W.2d at 250). "[W]hether a lower court has made the findings required under *Austin* presents a question of law, which is subject to de novo review." *Modtland*, 695 N.W.2d at 605.

At the probation-violation hearing, Maqadin admitted that he had consumed alcohol and had been arrested and cited for DWI. Maqadin admitted that he did not have an excuse for his consumption of alcohol but explained: "I just relapsed. My—my cousin just got killed the other day and, you know, I was feeling miserable. And—and I know I'm a human being, I make mistakes . . . ." The district court found that Maqadin violated a condition of his probation by consuming alcohol and that the violation was intentional and inexcusable. Maqadin does not challenge the court's findings on the first and second *Austin* factors on appeal. He instead argues that the court abused its discretion by revoking his probation because "the court did not articulate sufficient findings on the third *Austin* factor" and because "revocation was not warranted under the circumstances."

When considering the third *Austin* factor, "district courts must bear in mind that policy considerations may require that probation not be revoked even though the facts may allow it and that the purpose of probation is rehabilitation and revocation should be used only as a last resort when treatment has failed." *Id.* at 606 (quotations omitted). "When determining if revocation is appropriate, courts must balance the probationer's interest in freedom and the state's interest in insuring his rehabilitation and the public safety, and base their decisions on sound judgment and not just their will." *Id.* at 606–07 (quotations

4

omitted). "The decision to revoke probation cannot be a reflexive reaction to an accumulation of technical violations but requires a showing that the offender's behavior demonstrates that he or she cannot be counted on to avoid antisocial activity." *Osborne*, 732 N.W.2d at 253 (quotation omitted). The supreme court has instructed that, when making findings on the third *Austin* factor, district courts should consider whether:

> "(i) confinement is necessary to protect the public from further criminal activity by the offender; or
> (ii) the offender is in need of correctional treatment which can most effectively be provided if he is confined; or
> (iii) it would unduly depreciate the seriousness of the violation if probation were not revoked."

*Modtland*, 695 N.W.2d at 607 (quoting *Austin*, 295 N.W.2d at 251).

Maqadin argues that the district court failed to make a sufficient finding on the third *Austin* factor. The supreme court has emphasized that, "in making the three *Austin* findings, courts are not charged with merely conforming to procedural requirements" and that "courts should not assume that they have satisfied *Austin* by reciting the three factors and offering general, non-specific reasons for revocation." *Id.* at 608. "[R]ather, courts must seek to convey their substantive reasons for revocation and the evidence relied upon." *Id.*

At the probation-violation hearing, the district court heard arguments from the state and Maqadin and a recommendation in favor of revocation from Maqadin's probation officer. The court explained its decision to revoke Maqadin's probation as follows:

> [I]t's a tough case. A few things, as I look back on the case, when I heard you originally and now that I've heard more of it stand out. First one, is from where we started from, back when you were sentenced, and that was that this is—was a very serious case. I know that you weren't the person that was the aggressor but you were working with that person and your

5

action was not to help the person that was lying unconscious and bleeding on the floor. But it was to run away carrying his wallet without taking any step to make sure that he was safe. That was why I gave you 57 months of prison time that was stayed because your role was minimal but it was in an occurrence that was extremely severe.

The second thing that was significant, was what you said yourself, and that your behavior was very much influenced by your chemical use. I've actually reviewed the sentencing transcript where you told me how your judgment, is impaired and you make very poor choices when you've been using chemicals, and that you and your attorney both expressed to me your strong commitment and your strong desire. Which I thought were sincere, that's why I departed in the first place, um, to get a control over your chemical dependency, so you wouldn't use, so you wouldn't be in a position to make um the same types of bad choices that left [J.C.] unconscious at the Eden Prairie Lifetime Fitness.

You know the conclusion that I came to and I think you did as well, at the time, is when you use you're dangerous. Not only to yourself but to others whether it's making choices like with [J.C.] or even if you weren't driving [for the charged DWI offense]—and I haven't heard evidence that you were driving so I'm not basing this on a conclusion that you were driving while you were at a .17—but you were in an environment that whether or not the driver was sober or not affected by alcohol, it's an environment where bad things can happen.

You took steps to try and get a hold of your chemical dependency, you went to Teen Challenge which most . . . recognize is one of the most rigorous programs that are available. With that being on the horizon and with your commitment to permanently addressing your chemical dependency, I was willing to depart. But once you get released from Teen Challenge, um, so quickly relapse and whether or not it's as [the state] suggests that you're not taking your sobriety seriously, or whether or not it's a function of the level of chemical dependency that exists. The end result is the same that you very quickly used. You're very susceptible to using when you're not in a completely structured environment.

6

Such that even though in a normal case, uh, if someone uses, they relapse because of you know chemical use, it's very rare to revoke someone completely. I think this is that type of case where a revocation base[d] on a single violation of a no use provision is appropriate. Given what happens to your behavior when you do use, and how quickly you seem to relapse and use, when the opportunity in the community presents itself.

So what I am going to do on the third Austin factor is find that it is necessary to revoke the stay and send you to prison for 57 months. Both to protect the public, cause I don't have confidence that outside—in the outside community that you would be able to remain sober and make good choices. And also because you do succeed in a more structured environment, it seems like, that's what Teen Challenge was like. And that's where prison can provide the correctional treatment, I think, that may not be a[s] successful as in the outside world. So I am going to revoke the stay of execution . . . .

Although the district court did not expressly find that the policies favoring probation no longer outweighed the need for confinement, the court based its decision to revoke Maqadin's probation on two of the subfactors considered when determining whether the need for confinement outweighs the policies favoring probation—specifically, whether confinement is necessary to protect the public and whether the offender is in need of treatment that can most effectively be provided in confinement. *Id.* at 607. And the court discussed at length the factual basis for its decision to revoke Maqadin's probation. We conclude that the district court made a sufficient finding on the third *Austin* factor. *Cf. State v. Rottelo*, 798 N.W.2d 92, 94 (Minn. App. 2011) (stating that "[t]he district court made the appropriate [*Austin*] findings" where district court found on the third *Austin* factor that "confinement is necessary, because not to execute the sentence would unduly depreciate

the seriousness of the violation if probation were not revoked" and that "the only way [the court] can be assured that [defendant] does have treatment is to have it take place in a correctional facility because he has not kept in contact with Probation" (quotations omitted)), *review denied* (Minn. July 19, 2011).

Maqadin also challenges the evidentiary support for the district court's findings that revocation was necessary to protect the public and that Maqadin was in need of treatment that could most effectively be provided in confinement. Maqadin argues that he "had not committed any new crimes" and "did not present any threat to public safety" because he did not participate in the violence of the underlying offense and because there was no indication that he becomes violent when intoxicated. And Maqadin argues that treatment had not failed him because he "responded well to treatment [at Teen Challenge] and there [wa]s no reason to believe he would not build on that success while in the intensive outpatient program recommended by the [chemical-dependency assessor]."

The district court partially based its decision to revoke Maqadin's probation on the impact of Maqadin's chemical use on his involvement in the aggravated robbery and his relapse soon after completing Teen Challenge. In the presentence investigation report, Maqadin indicated that he regularly smoked marijuana and consumed alcohol to the point of intoxication and that, on the day of the aggravated robbery, he smoked marijuana before and after the robbery. At the sentencing hearing, Maqadin's attorney argued that Maqadin's chemical use "at least indirectly created the situation that he is in." And Maqadin told the court that he made the "crucial mistake of being impaired and unable to think properly on the day of the [aggravated robbery]." Maqadin stated: "My judgment on the day of the

8

[aggravated robbery] had a lot to do with me being impaired and not making the right decision. If I were in a better condition I would not have reacted like that on the day of the [robbery]." Although Maqadin completed inpatient treatment at Teen Challenge in early July 2015, he was arrested on July 29 for DWI and had an alcohol concentration of 0.17. And in his chemical-dependency assessment, Maqadin reported that he "continued to use marijuana despite recently completing a treatment program."

The district court also based its decision to revoke Maqadin's probation on the serious nature of his aggravated-robbery conviction. District courts may properly consider the severity of an underlying offense when making findings on the third *Austin* factor. *See Modtland*, 695 N.W.2d at 607 (directing district courts to consider ABA standards that courts should not revoke probation unless courts find one of three conditions is satisfied "'on the basis of the original offense and the intervening conduct of the offender'" (quoting *Austin*, 295 N.W.2d at 251)); *cf. Osborne*, 732 N.W.2d at 253 (stating that "[d]espite the . . . ABA [s]tandards' direction to consider only the offense and intervening conduct, determining the threat to the public and the need for confinement will, on occasion, require analysis of a defendant's juvenile record"). And the supreme court has concluded that a defendant who committed a "severe" underlying offense was "entitled to less judicial forbearance." *Osborne*, 732 N.W.2d at 254 (quotations omitted). In reaching its conclusion, the supreme court relied on the Minnesota Sentencing Guidelines, which stated:

> "Great restraint should be exercised in imprisoning those violating conditions of a stayed sentence who were convicted originally of low severity offenses or who have short prior criminal histories. . . . *Less judicial forbearance is urged for persons violating conditions of a stayed sentence who were*

9

> *convicted of a more severe offense or who had a longer criminal history.* Even in these cases, however, imprisonment upon a technical violation of the conditions of a stayed sentence should not be reflexive."

*Id.* (emphasis added) (quoting Minn. Sent. Guidelines III.B).

Here, Maqadin was convicted of aiding and abetting first-degree aggravated robbery, which is a severity-level 8 offense and carries a minimum presumptive executed sentence of 48 months' imprisonment. Minn. Sent. Guidelines 2.C, 4.A, 5.A (Supp. 2013). Maqadin was thus entitled to less judicial forbearance than a person convicted of a less-severe offense. *Cf. Osborne*, 732 N.W.2d at 254 (concluding defendant was entitled to "less judicial forbearance" based on commission of severity-level IX offense (quotation omitted)).

Maqadin also argues that the district court erroneously failed to consider any community-based treatment programs as alternatives to revoking his probation. But the record reflects that the court here determined that a community-based treatment program would be insufficient to rehabilitate Maqadin. While the chemical-dependency assessment recommended Maqadin be placed in an intensive, outpatient treatment program, the court stated that Maqadin "quickly relapse[d]" after completing the inpatient treatment program at Teen Challenge, which the court noted "is one of the most rigorous programs that are available." The court stated that Maqadin is "very susceptible to using when [he is] not in a completely structured environment"; that it did not "have confidence that . . . in the outside community [Maqadin] would be able to remain sober and make good choices"; and

10

that "[Maqadin] d[id] succeed in a more structured environment," so it believed that prison could provide the treatment necessary for Maqadin to be successful.

Based on the impact of chemical use on Maqadin's commission of aiding and abetting aggravated robbery, his continued consumption of alcohol and marijuana after completing inpatient treatment at Teen Challenge, and the serious nature of the aggravated-robbery offense, the record supports the district court's findings on the third *Austin* factor. *Cf. id.* at 254–56 (concluding that district court did not abuse its discretion by revoking defendant's probation based in part on defendant's "minor" violation of marijuana use because defendant's underlying offense was "severe," his criminal history was "lengthy," and decision to revoke probation was not "reflexive" as the court "took pains to consider all relevant facts and details and issued a thorough explanation of its decision" (quotations omitted)); *State v. Losh*, 694 N.W.2d 98, 102 (Minn. App. 2005) (concluding that district court did not abuse its discretion by revoking defendant's probation based on single incident of drug use where underlying offense "was the result of the abuse of drugs and alcohol and poor choices" and "allow[ing defendant] to again use or be involved with people who use chemicals in violation of the conditions of probation would not serve the public interest" (quotations omitted)), *aff'd*, 721 N.W.2d 886 (Minn. 2006); *State v. Ehmke*, 400 N.W.2d 839, 840–41 (Minn. App. 1987) (affirming revocation of probation where defendant was intoxicated at time of underlying offense and defendant violated probation by receiving multiple DWI convictions). We conclude that the district court did not abuse its discretion by revoking Maqadin's probation.

**Affirmed.**